THE STANTON CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 89796. Promulgated April 4, 1941.

*Hugh Satterlee, Esq.,* and *I. Herman Sher, Esq.,* for the petitioner. *Allen T. Akin, Esq.,* and *E. O. Hanson, Esq.,* for the respondent.

66

## OPINION.

BLACK: The sole issue for us to decide in this proceeding is whether petitioner is subject to taxation under section 104 of the Revenue Acts of 1928 and 1932. The material provisions of both acts are identical and are printed in the margin.[1]

The applicable regulations are articles 541, 542, and 543 of Regulations 74 and 77, respectively, as they were promulgated on February 15, 1929, and February 10, 1933, respectively. These articles in both regulations are identical, with the exception of two instances which are not material here. Articles 541, 542, and 543 of Regulations 74, in so far as is material, are printed in the margin.[2]

---

[1] SEC. 104. ACCUMULATION OF PROFITS OF SURPLUS TO EVADE SURTAXES.

(a) If any corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, there shall be levied, collected, and paid for each taxable year upon the net income of such corporation a tax equal to 50 per centum of the amount thereof, which shall be in addition to the tax imposed by section 13 and shall be computed, collected, and paid upon the same basis and in the same manner and subject to the same provisions of law, including penalties, as that tax.

(b) The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax.

(c) As used in this section the term "net income" means the net income as defined in section 21, increased by the sum of the amount of the dividend deduction allowed under section 23 (p) and the amount of the interest on obligations of the United States issued after September 1, 1917, which would be subject to tax in whole or in part in the hands of an individual owner.

(d) The tax imposed by this section shall not apply if all the shareholders of the corporation include (at the time of filing their returns) in their gross income their entire distributive shares, whether distributed or not, of the net income of the corporation for such year.  *  *  *

[2] ART. 541. *Taxation of corporation utilized for evasion of surtax.*—Section 104 is designed to discourage the formation or use of a corporation for the purpose of preventing the imposition of surtaxes upon its shareholders, through the device of permitting its gains and profits to accumulate instead of being distributed. If a domestic or foreign corpora-

74

The question whether petitioner was formed or availed of for the purpose mentioned in section 104 is one of ultimate fact rather than law. Our function is to draw inferences, to weigh the evidence, and to declare the result. The respondent's determination that section 104 applies is presumed to be correct until the contrary appears from the evidence. Section 104 (b) mentions certain facts, which, if any one is present, shall be prima facie evidence of the condemned purpose. The presumption thus arising under subsection (b) is in addition to

tion is so formed or availed of, it is subject to a tax at the rate of 50 per cent upon its net income in addition to the tax imposed by section 13.  *  *  *

ART. 542. *Purpose to escape surtax.*—Prima facie evidence of a purpose to escape the surtax exists where a corporation is a mere investment company, where a corporation has practically no business except holding stocks, securities, or other property and collecting the income therefrom or investing therein, or where a corporation other than a mere holding or investment company permits its gains and profits to accumulate beyond the reasonable needs of the business. The statutory presumption that a mere holding or investment company is subject to the additional tax imposed by section 104 may be overcome if the corporation can show, either by reason of the fact that it distributed a large portion of its earnings for the year in question, or that its stock was held not by the members of a family or of a small group but by a large number of persons and in comparatively small blocks, or by other evidence, that it was not availed of for the purpose of preventing the imposition of the surtax upon its shareholders.

The business of a corporation is not merely that which it has previously carried on, but includes in general any line of business which it may legitimately undertake. However, a radical change of business when a considerable surplus has been accumulated may afford evidence of a purpose to escape the surtax. When one corporation owns the stock of another corporation in the same or a related line of business and in effect operates the other corporation, the business of the latter may be considered in substance the business of the first corporation. Gains and profits of the first corporation put into the second through the purchase of stock or otherwise may therefore, if a subsidiary relationship is established, constitute employment of the income in its own business. To establish that the business of one corporation can be regarded as including the business of another it is ordinarily essential that the first corporation own substantially all of the stock of the second. Investment by a corporation of its income in stock and securities of another corporation is not without anything further to be regarded as employment of the income in its business.

ART. 543. *Unreasonable accumulation of profits.*—An accumulation of gains and profits is unreasonable if it is not required for the purposes of the business, considering all the circumstances of the case. It is not intended, however, to prevent reasonable accumulations of surplus for the needs of the business. No attempt can be made to enumerate all the ways in which gains and profits of a corporation may be accumulated for the reasonable needs of the business. Distributions made by a corporation shortly after the close of its taxable year shall be taken into consideration in determining the reasonableness of the amount of earnings and profits of the corporation retained by it for such year. Undistributed income is properly accumulated if invested in increased inventories or additions to plant reasonably needed by the business. It is properly accumulated if retained for working capital required by the business or in accordance with contract obligations placed to the credit of a sinking fund for the purpose of retiring bonds issued by the corporation. In the case of a banking institution the business of which is to receive and loan money, using capital, surplus, and deposits for that purpose, undistributed income actually represented by loans or reasonably retained for future loans is not accumulated beyond the reasonable needs of the business. The nature of the investment of gains and profits is immaterial if they are not in fact needed in the business. It is an unreasonable accumulation of gains and profits by corporations with the purpose of enabling their shareholders to escape surtaxes on such gains and profits which subjects such corporations to the additional tax imposed by section 104. Among other things, the financial condition of the corporation at the close of the taxable year and the manner in which its funds are invested at that date, determine the reasonableness of the accumulations.

*       *       *       *       *       *       *

the presumption of correctness attaching to the respondent's determination. Any of these presumptions that may exist are rebuttable, however, and the respondent can not prevail if there is satisfactory proof that petitioner was neither formed nor availed of for the purpose mentioned in the statute. Olin Security Co., 42 B. T. A. 1203, and cases therein cited.

Although the respondent did not indicate in his deficiency notice the ground upon which his determination was based other than that petitioner was "subject to taxation under the provisions of section 104", he now contends that the evidence shows (1) that during the taxable years in question petitioner was a mere holding or investment company, (2) that during those years petitioner permitted its gains or profits to accumulate beyond the reasonable needs of the business, (3) that petitioner was formed for the disapproved purpose, and (4) that during the taxable years petitioner was availed of for the same purpose. We shall consider these contentions in the order named.

1. The words "mere holding or investment company" are not defined in the statute. Petitioner relies upon the interpretation afforded by article 542, supra, and contends that petitioner's business, in addition to "holding stocks, securities, or other property and collecting the income therefrom or investing therein", must also be regarded as including the businesses being conducted by New York and Louisiana, and when so viewed it can not be found to be a mere holding or investment company, citing in support thereof Mellbank Corporation, 38 B. T. A. 1108, and Industrial Bankers Securities Corporation v. Higgins, 104 Fed. (2d) 177. We do not think, however, that the businesses being conducted by New York and Louisiana may be considered in substance the business of petitioner. Article 542 in this connection provides: "To establish that the business of one corporation can be regarded as including the business of another it is ordinarily essential that the first corporation own substantially all of the stock of the second." Petitioner did not own substantially all of the stock of either New York or Louisiana. The term "substantially all" as construed by the courts has been generally held to include percentages in excess of 90 percent, and there is almost complete uniformity in the decisions to the effect that 85 percent is not substantially all. See sec. 38.94, vol. 4, Paul and Mertens; Burnet v. Bank of Italy, 46 Fed. (2d) 629; certiorari denied, 283 U. S. 846. During the taxable years in question section 141 of the Revenue Acts of 1928 and 1932 required an ownership of at least 95 percent as a prerequisite to file consolidated returns. During these years petitioner owned only 83⅓ percent of the stock of New York and 50.7 percent of the common stock and 83 percent of the preferred stock of Louisiana. It filed its returns for 1931 and 1932 on a separate

basis, and we think that whether it was a mere holding or investment company must be determined upon the basis of its separate business, exclusive of the businesses of New York and Louisiana. In this manner petitioner was quite different from the taxpayer in *Industrial Bankers Securities Corporation* v. *Higgins, supra.* In that case the taxpayer owned 100 percent of the stock of the subsidiaries there involved.

In so holding we have not overlooked the phrase "ordinarily essential" in the quoted sentence from article 542. No doubt the effect that phrase was intended to have was that in some cases the business of one corporation might be regarded as including the business of another, even though the first corporation might own a little less than "substantially all" of the stock of the second. We think, however, that these exceptional cases were intended to be limited to those where, as stated in a previous sentence of article 542, the first corporation "in effect operates the other corporation." In this connection petitioner argues that it was "a management, a financing and, in a broad but very real sense, an insurance company." The record does not show that petitioner exercised any managerial control over either the New York or the Louisiana company, or in effect operated them. These companies had their own officers and boards of directors, who developed their policies and carried on their activities. True, Aron, who was a member of all the boards, was instrumental in developing the policies of all the companies, but this fact does not place petitioner in the business of managing, supervising, and operating those companies, as was the situation in *Mellbank Corporation, supra.*

In *Chicago Stock Yards Co.*, 41 B. T. A. 590, the Board, in referring to the phrase "mere holding or investment company", said:

\* \* \* It was apparently the intention of Congress in using the phrase to differentiate a holding or investment company actively engaged in a trade or business from one which has income only from interest and dividends and profits from the sale of securities, and limits its activities to those incident to an ordinary holding or investment company.

During the taxable years 1931 and 1932, petitioner's income consisted exclusively of interest, dividends, and gains from the sales of securities for its own account. Its expenses consisted of interest, taxes, and a few miscellaneous amounts. The itemized items of income and expenses are in our findings, which show that during these years petitioner's net available gains and profits amounted to $907,062.49 and $116,086.05, respectively. Of these amounts petitioner distributed as dividends $185,425 in 1931 and $29,668 in 1932, and accumulated the balance, which amounted to $808,055.54 for both years.

An examination of the evidence in our opinion shows that petitioner's principal activity in the taxable years and years prior thereto, aside from collecting interest and dividends and making a few sales

of securities for its own account, was borrowing money from the Aron family to purchase additional securities and to make loans to Hamptworth, which corporation owned the country estate occupied by the Arons. In our opinion these activities are no more than those incident to an ordinary holding or investment company and, when considered in the light of the fact that all of petitioner's stock as well as the stock of Hamptworth was owned by petitioner, his wife, and by petitioner in trust for his son, and also in the light of the fact that petitioner was organized mainly for the purpose of taking over the securities already held by J & H, undoubtedly a mere holding or investment company, we have no hesitation in finding as a fact that petitioner was a mere holding or investment company. *Chicago Stock Yards Co., supra.*

2. Did petitioner during the taxable years permit its gains or profits to accumulate beyond the reasonable needs of the business instead of dividing or distributing them? We have found as a fact that it did. Petitioner contends that our finding should be in the negative. It divides its argument on this phase of the case into two parts—first, that petitioner did not permit its gains and profits for the taxable years to accumulate at all, and, second, that the gains and profits were not at any time or in any event permitted to accumulate beyond the reasonable needs of the business.

There is no merit in petitioner's contention that it did not permit its gains and profits for the taxable years to accumulate at all. The evidence clearly shows that during 1931 and 1932 petitioner had gains and profits of $907,062.49 and $116,086.05, respectively, and that during these years it distributed $185,425 and $29,668, respectively. By simple subtraction it thus permitted its gains and profits for these years to accumulate in the respective amounts of $721,637.49 and $86,418.05, instead of being divided or distributed.

Petitioner contends, however, that only a part of the $907,062.49 and $116,086.05 represents gains and profits of the taxable years. It argues that since $800,320 of the $907,062.49 represents dividends from New York and Louisiana, and, since $19,920 of the $116,086.05 represents dividends from Louisiana, these dividends can only be considered as gains and profits of the taxable years to the extent that they represent profits of New York and Louisiana for the taxable years. Petitioner then makes an analysis of the net income and distributions of New York and Louisiana for several years and comes to the conclusion that of the $750,000 dividend received by petitioner during 1931 from New York only $104,754.90 represented 1931 profits of New York and $645,245.10 represented profits accumulated by New York prior to 1929; that of the $50,320 dividend received by petitioner during 1931 from Louisiana only $7,275 represented 1931 profits of Louisiana and $43,045 represented profits accumulated by Louisiana in 1927; and

that all of the $19,920 dividend received by petitioner during 1932 from Louisiana represented profits accumulated by Louisiana from 1925 to 1927. On this basis petitioner contends that its total gains and profits for 1931 and 1932 amounted to $314,938.44, computed as follows:

| | |
|---|---:|
| Miscellaneous income for 1931 ($907,062.49 minus $800,320) | $106,742.49 |
| 1931 Profits of New York | 104,754.90 |
| 1931 Profits of Louisiana | 7,275.00 |
| Petitioner's 1931 gains and profits | 218,772.39 |
| Miscellaneous income for 1932 ($116,086.05 minus $19,920) | 96,166.05 |
| Total | 314,938.44 |

Petitioner then contends that there should be added to the distributions of $185,425 in 1931 and $29,668 in 1932, $118,736.03 of the distribution by petitioner on May 26, 1933, in the amount of $207,676, on the ground that $88,939.97 of the 1933 distribution was from 1933 gains and profits and $118,736.03 from 1932 gains and profits. On this basis petitioner says it distributed during 1931 and 1932 a total amount of $333,829.03, which is in excess of the above amount of $314,938.44, thus proving, so petitioner contends, that it did not permit its gains and profits for the taxable years to accumulate at all.

The general rule in tax cases, as in other cases, is that a corporation and its stockholders are to be treated as separate entities. *Burnet* v. *Clark*, 287 U. S. 410, 415; *Burnet* v. *Commonwealth Improvement Co.*, 287 U. S. 415, 420; *Dalton* v. *Bowers*, 287 U. S. 404, 410. Cf. *Mead Corporation* v. *Commissioner*, 116 Fed. (2d) 187. Prior to the declaration of the dividends in 1931 and 1932 by New York and Louisiana, petitioner had no proprietary interest in the accumulated gains and profits of those companies. *United States* v. *Phellis*, 257 U. S. 156. But, when those dividends were declared by New York and Louisiana in 1931 and 1932, they became gains and profits of the petitioner to the extent of petitioner's stock ownership in the declaring companies. *Lynch* v. *Hornby*, 247 U. S. 339. Cf. *Helvering* v. *Canfield*, 291 U. S. 163, wherein the Court said:

\* \* \* When a corporation continued in business after March 1, 1913, the dividends it later declared and paid to its stockholders, whether out of current earnings or from profits accumulated prior to that date, constituted income to the stockholders, and not capital, and were taxable as income if the Congress saw fit to impose the tax. *Lynch* v. *Hornby*, 247 U. S. 339, 38 S. Ct. 543, 62 L. Ed. 1149.

It follows that petitioner is in error in its contention that its share of the dividends of New York and Louisiana declared in 1931 and 1932 can only be considered as gains and profits in those years to the extent that they represent profits of New York and Louisiana for

the taxable years. We think petitioner is also wrong in adding $118,736.03 distributed by petitioner to its stockholders May 26, 1933, to the distributions made in 1932, when as a matter of fact only $29,668 was actually distributed during that year. There is no basis for adding this $118,736.03 to the amount distributed in 1932.

In an attempt to show that it did not permit its gains and profits for the taxable years to accumulate at all, petitioner has also set out in its brief complicated schedules of income, deductions, and distributions on a so-called consolidated basis, in which petitioner's activities have been combined with the activities of New York, Louisiana, 95 Wall, Lafayette, and California. Suffice it to say that such schedules are not material in this proceeding, if for no other reason than that petitioner did not own substantially all the stock of any of the corporations named. The businesses of these corporations can not be regarded as the businesses of petitioner.

Neither is there any merit in petitioner's contention that its gains and profits were not at any time or in any event permitted to accumulate beyond the reasonable needs of the business. We have found as a fact that petitioner was a mere holding or investment company. Such a company has very little need, if any, for the accumulation of gains or profits. Cf. *Williams Investment Co.* v. *United States*, 3 Fed. Supp. 225; *Keck Investment Co.*, 29 B. T. A. 143; affd., 77 Fed. (2d) 244; certiorari denied, 296 U. S. 633; *R. & L. Inc.*, 33 B. T. A. 857; affd., 84 Fed. (2d) 721; certiorari denied, 299 U. S. 588; *Nipoch Corporation*, 36 B. T. A. 662; *Chicago Stock Yards Co.*, *supra*. In the latter case we said:

As a holding company, the petitioner had no need for the accumulation of gains and profits. In the ordinary holding or investment company the excess of income over expenses is either paid out in dividends or invested in additional income-producing assets. That is the use which the petitioner made of its excess income. That use can not be regarded within the reasonable needs of the business.

Up to December 31, 1930, the beginning of the taxable years in question, petitioner had accumulated gains and profits of $2,132,316.37, including $560,886.70 which it took over from J & H at the time petitioner was organized. Cf. *Commissioner* v. *Sansome*, 60 Fed. (2d) 931. During the taxable years it further accumulated its gains and profits in the total amount of $808,055.54, thus bringing its total accumulation of gains and profits on December 31, 1932, up to $2,940,371.91 on which date it declared a *stock* dividend of $2,225,100. Since the interests of petitioner's stockholders in petitioner were not changed by the stock dividend, the declaration of the latter has no bearing on the question now before us. Cf. *Koshland* v. *Helvering*, 298 U. S. 441.

Petitioner devotes practically all of its argument under this part to the contention that, in considering the needs of the business, we must consider the needs of the businesses of New York and Louisiana. The businesses of these concerns were not petitioner's businesses. It did not operate them. Cf. *Olin Security Co., supra.* Prior to 1933 petitioner had never loaned these companies any money or securities, but on the contrary had borrowed from New York. Beginning in 1933, petitioner did make substantial loans to New York and Louisiana. But, since Aron and his wife and son owned all of petitioner's stock, these loans could have been made by petitioner's stockholders if petitioner had distributed its gains and profits instead of permitting them to accumulate. *Helvering* v. *National Grocery Co.*, 304 U. S. 282.

In addition to the cases heretofore cited petitioner, in support of its argument on this phase of the case, relies strongly on *Delaware Terminal Corporation*, 40 B. T. A. 1180, and also cites *Charleston Lumber Co.* v. *United States*, 20 Fed. Supp. 83; appeal dismissed by Fourth Circuit at 93 Fed. (2d) 1018. The *Delaware Terminal* case is distinguishable from this proceeding for the same reasons we gave for distinguishing *Industrial Bankers Securities Corporation* v. *Higgins, supra.* The Delaware Terminal Corporation owned 100 percent of the stock of the Terminal Barber Shops, Inc., which corporation in turn owned 100 percent of the stock of approximately 14 subsidiaries. Petitioner did not own substantially all the stock of any of the Aron companies. Furthermore, the stock of the Delaware Terminal Corporation was not owned by a closely related family group, but by a group of business associates, the largest stockholder being Schusser, who owned a little less than 50 percent. Here all of the stock of petitioner was owned by a closely related family group—father, mother, and son. The *Charleston Lumber Co.* case involved an operating corporation and not a mere holding or investment company, such as we have found petitioner to be in the instant proceeding. In *R. & L. Inc.* v. *Commissioner, supra*, the court in affirming the Board, among other things, said:

\* \* \* The only active business that the corporation engaged in was that in which it earned the commissions. That required no capital except the salary of the employee Bryan. There was no need of more capital to carry on business which prevented paying out its net profits in dividends. In 1927 and 1928 no reason is suggested for not declaring dividends except that the cash money received as income was put into additional stocks and real estate. This is just the accumulation which the tax is intended to discourage.

3. Was petitioner formed for the disapproved purpose? Petitioner contends that it was not, and relies among other things upon the oral testimony of Aron, in which he categorically denied that he had any such purpose in mind when he formed either J & H or the petitioner.

We can not, however, accept this testimony as conclusive in the light of other evidence which in our opinion is inconsistent with those statements. *Helvering* v. *National Grocery Co., supra; Reynard Corporation*, 37 B. T. A. 552, 561. At the time petitioner was formed Aron had decided to divide the properties of J & H between two new holding companies. As set out in our findings, Hamptworth was incorporated on October 13, 1925, and petitioner on the following day. Hamptworth issued one-half of its authorized capital stock to members of the Aron family for $50,000 in cash, which it used to acquire the real estate held by J & H. Petitioner issued one-half of its authorized capital stock to members of the Aron family for all the outstanding capital stock of J & H on the basis of one share for two shares, so that each stockholder of J & H maintained the same proportion of holdings in petitioner which he or she had held in J & H.

Petitioner then took over all the assets of J & H, consisting mainly of stock of Louisiana and other securities, and assumed all of its liabilities, whereupon J & H was dissolved. During its existence J & H had accumulated net gains and profits of $560,886.70, chiefly from dividends, interest, gain from the sale of securities, and rent paid by Aron for use of the real estate as a residence and for use of the yacht. J & H never paid a dividend. The $560,886.70 of accumulated gains and profits were taken over by petitioner and thus became available for distribution by petitioner. *Commissioner* v. *Sansome, supra*. Petitioner then proceeded to accumulate more gains and profits exclusively from interest, dividends, the sale of securities, except for $3,600 of miscellaneous income in 1929, until at the beginning of the taxable years in question it had accumulated gains and profits (including those taken over from J & H) of $2,132,316.37 after paying dividends during this period of $745,850, or 25.9 percent of its gains and profits of $2,878,166.37 available for distribution. Aron testified that petitioner was formed:

Principally to coordinate or unify into one company all the companies, first the Louisiana, with the intention of later also acquiring these in New York; putting all the outside securities of all the family in one company as a reservoir and being able to have them all together so that on short notice you could use them for the benefit of the operating companies, and also to buy and sell securities and to use the securities for margin, both in stock as well as moneys. It would be a reservoir to have them all together because I was given assurance against the guarantee that I was giving for the operating companies, and by having the— Stanton became a Delaware Corporation which were very liberal in their charter, and in that way you could save State taxes in New York.

Petitioner's books show, however, that as soon as petitioner was formed it commenced to loan money without interest to Hamptworth and continued to loan money to Hamptworth every year until at the beginning of the taxable years it had loaned Hamptworth a total of $988,956.29, which Hamptworth used to improve the real estate occu-

pied by the Aron family as a country estate and to purchase a yacht and considerable household furnishings. In 1929, at a time when petitioner did not own any of the stock of New York, it loaned without interest $482,841.76 to 95 Wall, a 100 percent owned subsidiary of New York, which loan, without any repayments, was still outstanding on December 31, 1937. In discussing the previous points we have already stated the amounts of gains and profits and dividends paid during the taxable years, during which years petitioner added $808,055.54 more to its accumulation, thus making a total accumulation of gains and profits on December 31, 1932, of $2,940,371.91.

Petitioner continued to make loans to Hamptworth until on December 31, 1934, it had loaned Hamptworth a total of $1,222,575.48. In 1935 a part of this loan was liquidated through the organization by the Arons of the Bristol Associates, Inc., as set out in our findings, and the balance was apparently charged off by petitioner as a bad debt in its 1935 income tax return.

As a result of the accumulation of $2,940,371.91 over a period of years, surtaxes were avoided by the shareholders of J & H and petitioner in the total amount of approximately $590,000.

Considering all the evidence in the case, particularly the circumstances surrounding the formation of petitioner, the sources of its income, the manner in which that income was used, and the surtaxes that were avoided, we are of the opinion that petitioner was formed for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, and we have so found as a fact in our findings.

4. Was petitioner availed of in 1931 or 1932 for the disapproved purpose? In *Helvering* v. *National Grocery Co.*, *supra*, the Supreme Court said that the function of the Board in a case of this kind was "To draw inferences, to weigh the evidence and to declare the result * * *." We have already found that petitioner was a mere holding or investment company and that it permitted its gains and profits to accumulate beyond the reasonable needs of the business. The statute makes such facts "prima facie evidence of a purpose to escape the surtax." We have also found that petitioner was formed for that purpose and, even without the benefit of the presumptions, we think the evidence shows that petitioner was availed of in 1931 and 1932 for the purpose of enabling its shareholders to escape the surtax.

Beginning in 1916, Louisiana declared a dividend every year up to and including 1937, which is as far as the evidence goes. Prior to the formation of J & H those of the stockholders of Louisiana who became stockholders of J & H were required to pay surtaxes on such dividends. The same was true respecting the stocks of other domestic corporations which Aron purchased with the dividends received from Louisi-

ana. New York had adopted the policy of paying no dividends until the two dividends of $900,000 each in 1930 and 1931, although on December 31, 1929, it had accumulated gains and profits of $5,151,-246.32. When J & H was formed in 1922, the Arons transferred to that company 99.7 percent of all the stock held by them in Louisiana, but did not transfer to that company any of the stock of New York. Aron also transferred to J & H at the same time 8,020 shares of stock in ten different domestic corporations. This relieved the Arons of paying any surtax on the dividends being paid on such transferred stock, except to the extent that J & H might in turn declare dividends, which it never did. When petitioner was organized in 1925 it merely took over all the securities then held by J & H.

In 1918 Aron and Feingold entered into a written agreement the details of which are set out in our findings. Feingold had made several demands that New York declare a dividend, but until the latter part of 1930 Aron had been successful in persuading Feingold to silence his demands. In 1930, however, the matter came to a head, and New York in December of that year declared a dividend of $900,000. At the beginning of the year Aron held 25,746 of the 30,000 outstanding shares of New York. Had he held these shares until the dividend was declared he would have had to pay a substantial surtax thereon. But he did not so hold them. In January 1930 Aron transferred to petitioner 25,000 of his 25,746 shares of New York. Thus during the taxable years petitioner held practically all of the New York and Louisiana shares that had at some prior date been owned by the Aron family.

We think it is reasonable to infer and that it is apparent from the foregoing that the principal reason for Aron's transfer of the 25,000 shares to petitioner in 1930 was because he knew then, as a result of Feingold's demands, that eventually a dividend would have to be declared by New York. By having the dividend paid to petitioner instead of himself, Aron availed himself of petitioner for the purpose of escaping surtaxes. We do not think it makes any difference that the dividend-paying stocks were transferred to J & H and to petitioner in years prior to the taxable years before us. Cf. *United Business Corporation of America*, 19 B. T. A. 809; affd., 62 Fed. (2d) 754; certiorari denied, 290 U. S. 635; *A. & J., Inc.*, 38 B. T. A. 1248; *Williams Investment Co.* v. *United States, supra.* The thing that matters is whether during the taxable years petitioner was availed of for the forbidden purpose.

As a holding or investment company petitioner had very little reason for accumulating any gains or profits. Yet on December 31, 1930, the beginning of the taxable years in question, petitioner had accumulated $2,132,316.37 or 287.49 percent of its outstanding capital stock. During the taxable years it accumulated additional gains and profits

of $808,055.54. If this latter amount had been distributed instead of accumulated, petitioner's stockholders would have had to pay for these two years alone additional surtaxes of $162,566.28. These facts are not without significance. Furthermore, the stockholders of petitioner could have completely avoided the application of section 104 if in accordance with subsection (d) of this section they had included (at the time of filing their returns) in their gross income their entire distributive shares of petitioner's net income for the taxable years. This they did not do. They chose rather to avail themselves of petitioner for the purpose of escaping the surtax.

Upon the whole we think the evidence amply sustains the ultimate findings we have made.

In its brief petitioner makes the statement that the taxes asserted by the respondent were incorrectly computed through the inclusion in net income of interest wholly exempt from tax. This was not assigned as an error, and, even if it had been, the evidence does not support the contention.

The respondent's determination is approved.

Reviewed by the Board.

*Decision will be entered for the respondent.*

